UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
APPLIED INTERACT, LLC,

                Plaintiff,                04 Civ. 8713 (HB)

                - v-                      **OPINION & ORDER**

THE VERMONT TEDDY BEAR COMPANY, INC.

                Defendant.
------------------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge[*]:**

On November 4, 2004, Plaintiff, Applied Interact, LLC ("AI"), filed the instant action against Defendant, The Vermont Teddy Bear Company, Inc. ("VTB"). The Complaint alleges, inter alia, that VTB infringed certain patents currently licensed to AI. Presently before the Court is a motion by VTB for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, VTB's motion is DENIED.

## I. BACKGROUND

### A. Factual Background

On November 1, 2003, Intertech Holdings, LLC ("Intertech") entered into the "Exclusive License Agreement" with AI. (Adler Dec., Ex. C., Exclusive License Agreement) (herein, "License Agreement").[1] The License Agreement licenses sixteen patents, owned and held by Intertech, to AI, subject to certain terms and conditions. Id. Specifically, Section 2.1.1 of License Agreement, grants AI:

> [A]n exclusive (except as otherwise provided by Section 2.3 hereof) worldwide, non-transferable, and nonassignable license, with the right to sublicense, to use, practice, import, distribute, manufacture, have manufactured, offer to sell and sell the Patents and the technology and inventions claimed therein[.]

(License Agreement, at ¶ 2.1.1.) The exclusivity of the license is subject to Section 2.3 of the License Agreement which states that "(i) all licenses entered into prior to the date hereof (the "*Pre-Existing Licenses*"); and (ii) the RRS License and any sublicense thereunder." (License Agreement, at ¶ 2.3.) As such, the License Agreement provides AI with the right of exclusive

---
[*] Alissa Hazan, a summer 2005 intern in my Chambers, and currently a second year law student at New York University School of Law, provided substantial assistance in the research and drafting of this Opinion.
[1] AI is also owned by Intertech. (Adler Dec., Ex. H.)

1

use of each of the patents contained in the License Agreement, with the limited exception of the Pre-Existing Licenses and the RRS License (herein, collectively, "Pre-Existing Licenses"). While there are multiple Pre-Existing Licenses referred to in the License Agreement, each of these licenses is explicitly "non-exclusive." (Adler Dec., Ex. C-G.)

The License Agreement further provides AI with the freedom to sublicense the patents:

> The Parties acknowledge that Licensee intends to monitize and exploit the Patents through licensing or selling the same, and protecting the rights under, and preserving the value of, the Patents. . . and the Licensee shall take all steps necessary to cause any sublicense entered into by the Licensee . . . to be freely assignable by the Licensee.

(License Agreement, at ¶¶ 2.2; 3.3.)

Pursuant to the terms of the License Agreement, AI is also granted the "right to enforce and collect damages for any infringement relating to the Patents" (License Agreement, at ¶ 2.1.1) and acknowledges, upon issuance of sublicenses, that it will "protect[] the rights under, and preserv[e] the value of, the Patents by taking actions against person or entities infringing the Patents." (License Agreement, at ¶ 2.2.) Additionally, Intertech explicitly agrees, when it is a necessary party, "to participate in any litigation relating to or arising from one of more of the Patents." (License Agreement, at ¶ 3.2.)

## B. Procedural History

On November 4, 2004, AI filed the instant action for patent infringement against VTB and alleges four counts of infringement of United States Patent Nos.: (1) 5,227,874 (the "874 patent"), (2) 5,249,044 (the "044 patent"), (3) 5,508,731 (the "731 patent"), and (4) 5,713,795 (the "795 patent") (Am. Compl. ¶¶ 4-7) (herein, "patents-in-suit"). (Dckt. 1.) In particular, AI alleges that VTB "willfully infringed one or more claims of the '731' and '795' patents" and requests, inter alia, treble damages, reasonable attorney fees, expenses and costs, and damages in accordance with 35 U.S.C. § 284. (Am. Compl., Prayer for Relief.)

On June 9, 2005, VTB filed the instant motion for summary judgment on the grounds that AI lacked standing to institute this lawsuit.

## II. APPLICABLE STANDARD

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment

as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. Donahue, 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. **DISCUSSION**

VTB claims that AI lacks standing to sue VTB for patent infringement. In particular, VTB argues that because AI fails to possess "all substantial rights" in the patents-in-suit and failed to join the patent owner, Intertech, and, accordingly, VTB claims that AI lacks standing to sue "on its own." To address VTB's claim, it first must be determined whether AI is an exclusive licensee. If AI is an exclusive licensee, then the Court must determine whether it possesses "all substantial rights" in the patents-in-suit and need not have joined Intertech.

### A. **Requisite Standing**

Standing in a patent infringement case is derived from the Patent Act, which provides in pertinent part that "[a] patentee shall have a remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1994). The term "patentee" comprises "not only the patentee to whom the patent was issued, but also the successors in title to the patentee." 35 U.S.C. § 100(d). One such successor is an "exclusive licensee," which is defined as a "beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others" that include the proprietary right to prevent others from "making, using, or selling the invention in the United States." Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1032 (Fed. Cir.

3

1995). The Federal Circuit has consistently held that when an exclusive licensee acquires "all substantial rights" in a patent, the licensee qualifies as a "virtual assignee" and, consequently, may file an infringement suit on its own behalf. See Enzo APA & Son v. Geapag A.G., 134 F.3d 1090, 1090 (Fed. Cir. 1998).

However, absent "all substantial rights," an exclusive licensee lacks standing to sue third parties without joining the patentee. See Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001).[2] In addition, a licensee lacks standing with or without the patentee if the license agreement is non-exclusive or "bare." Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc. ("IPD"), 248 F.3d 1333, 1345 (Fed. Cir. 2001).

Here, the License Agreement provides AI the right to use, sublicense, and enforce the patents; in fact, the agreement is entitled the "Exclusive License Agreement." (License Agreement, at ¶ 2.1.1).[3] The language, particularly the "right to enforce," is evidence of Intertech's intent to assign sufficient proprietary rights from the "patentee's bundle of rights," and, thus, qualifies AI as an exclusive licensee.[4] Accordingly, as an exclusive licensee, AI's standing to sue on its own hinges on whether it possesses "all substantial rights" in the patents-in-suit. See Enzo, 134 F.3d at 1090.

## B. Exclusive Licensee With "All Substantial Rights"

An exclusive licensee's standing depends on whether sufficient rights were assigned. See IPD, 248 F.3d at 1344. To determine whether an exclusive licensee possesses "all substantial" patent rights, the Court must ascertain the intention of the parties and examine the substance of what was granted by the licensing agreement. See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991). The party that contends it has "all substantial rights" in the patent "must produce . . . written instrument[s] documenting the transfer of proprietary rights." Speedplay Inc. v. Bebop, Inc., 211 F.3d

---

[2] An exception to this rule exists in extraordinary circumstances where "the patentee is the infringer and cannot sue himself." Ortho Pharm. Corp. 52 F.3d 1026, 1030 (internal citations omitted).
[3] The License Agreement specifically grants AI the "right to sublicense, to use, practice, import distribute, manufacture, have manufactured, offer to sell and sell the Patents . . . including the right to enforce and collect damages for any infringement relating to the Patents[.]" (License Agreement, at ¶ 2.1.1.)
[4] See Ortho Pharm. Corp., 52 F.3d at 1032. While the AI license is subject to pre-existing, non-exclusive, licenses (License Agreement, ¶ 2.1.1), the existence of prior non-exclusive licenses fails to defeat exclusivity. See Refac Int'l, Ltd. v. Visa USA, Inc., No. 89 Civ. 2198, 1990 WL 130032, at *5–6 (N.D.Cal. Jun. 26, 1990) (citing Waterman v. Mackenzie, 138 U.S. 252, 261 (1891)).

1245, 1250 (Fed. Cir. 2000).[5]  If such a written document exists, it is then "helpful to look at what rights have been retained by the grantor, not only what was granted," Vaupel, 944 F.2d at 875, and, in particular, a licensee's right to (1) sue for infringement, (2) use the patent, and (3) sublicense, to determine whether a licensee has been granted "all substantial rights" in a patent.  See generally IPD, 248 F.3d at 1333; Speedplay, 211 F.3d at 1245; Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372 (Fed. Cir. 2000).[6]

    1A.   Right to Sue for Infringement

The right to sue for infringement is the principal entitlement examined in an evaluation of whether a license agreement transfers "all substantial rights."  Vaupel, 944 F.2d at 875.  Oft times this analysis is "particularly dispositive."  Id.  Whether AI controls the right to sue for infringement of the patents-in-suit depends largely on whether the licensee has been awarded substantial rights and, as a subsection thereof, did the licensor retain usage rights in the patents and did the licensor grant the licensee the right to sublicense.  Four cases from the Federal Circuit guide our analysis.  See IPD, 248 F.3d at 1343; Speedplay, 211 F.3d at 1251; Abbott Lab. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995); Vaupel, 944 F.2d at 875.

The Federal Circuit first addressed this issue in Vaupel.  There, the Federal Circuit advised that whether a licensee has the independent right to sue or "whether [the licensor] must be joined as a party" is "particularly dispositive."  Vaupel, 944 F.2d at 875.  Applied to the facts there, the Federal Circuit concluded that the plaintiff had standing because it was assigned the right to sue for past, present, and future infringements of the patent, subject only to the obligation to inform the patent holder of its intention to sue.  Id.

Four years later, in Abbott, the Federal Circuit revisited the extent to which a licensor's control over the right to sue affected a licensee's standing.  Abbott, 47 F.3d at 1132.  In Abbott, the Federal Circuit held that the rights under the license were not as substantial as those in Vaupel and the licensee lost.  Abbott, 47 F.3d at 1132.  While various factors led the Federal Circuit to hold that the plaintiff lacked standing, the focus of the analysis was on the "rights to sue" of the licensee and licensor.  Id.  In particular, although the license agreement

---

[5] It is undisputed that the License Agreement between AI and Intertech is the relevant written instrument provided that documents the transfer of rights.  (Adler Dec., Ex. C.)
[6] The Federal Circuit has also addressed the licensee's right to assign, but in each case, the licensor's consent to assign was required.  See generally IPD, 248 F.3d at 1333; Speedplay, 211 F.3d at 1245; Abbott Lab., 47 F.3d at 1128.  Here, AI must obtain Intertech's consent to assign the license.  Therefore, this factor is neutral.

provided the licensee with the right of first refusal to sue alleged infringers, if such a suit was not filed, the licensor possessed the right to initiate its own infringement action.  Id.  In addition, as further evidence that the licensor retained control over the right to sue, the Federal Circuit made note of both the licensor's right to choose its own counsel and the licensee's obligation not to "prejudice or impair the patent rights in connection with such prosecution or settlement."  Id.

With the Federal Circuit's decisions in Vaupel and Abbott as a backdrop, the Federal Circuit further articulated the interplay between the right to sue and standing in Speedplay.  In contrast to Abbott, the Federal Circuit in Speedplay determined that the plaintiff's standing was not thwarted by the licensor's retained option to sue.  Speedplay, 211 F.3d at 1251.  The Federal Circuit recognized that the licensors in both Abbott and Speedplay had the option to prosecute any infringement if the licensee did not do so, but only in Abbott was the licensee liable to the licensor for annual royalties on the sale of any sublicenses.  Speedplay, 211 F.3d at 1251.  Therefore, according to the Federal Circuit, the licensor's right to sue an infringer in Speedplay was "illusory" since the licensee could render the licensor's right to sue ineffective by merely "granting the alleged infringer a royalty-free sublicense."  Id.  As such, unlike the licensee in Abbott, the Speedplay licensee controlled "enforcement" of the patents "for all practical purposes."  Speedplay, 211 F.3d at 1251.

Most recently, in IPD, the Federal Circuit held that the licensee failed to possess "all substantial rights" in the patent in dispute, and, thus, lacked standing to sue "on its own."  IPD, 248 F.3d at 1344-45.  The licensee in IPD, as opposed to the licensee in Vaupel and Speedplay, had restrictions on its right to sue for infringement.  IPD, 248 F.3d at 1344-45.  The limitations included:  (1) the need to notify and consult with the licensor before the initiation of any litigation, (2) the need to obtain the licensor's consent to any settlement the licensee may enter into, (3) the need to obtain the licensor's consent to join the licensee in suit if the licensor was a necessary party, and (4) the licensor's option to withdraw such consent at any time.  Id.  These limitations evidenced the licensor's intent to maintain control over the enforcement of the patent, in general, and the right to sue, in particular and, thus, the Federal Circuit found the licensee unable to sue without joining the licensor.

Here, the License Agreement explicitly affords AI "the right to enforce and collect damages for any infringement relating to the Patents" (License Agreement, ¶ 2.1.1) and

6

further dictates that upon sublicensing, AI must "protect[] the rights under, and preserv[e] the value of, the Patents by taking actions against persons or entities infringing the Patents." (License Agreement, ¶ 2.2.) The language of the License Agreement provides that AI has the right to bring suit on its own without any limitations. In addition, none of the limiting conditions that led to the Federal Circuit's decision that the plaintiffs lacked standing in Abbott or IPD are present here. The License Agreement does not include any rules that AI must follow upon filing suit, and no right to sue is preserved if AI does not bring suit. Indeed, the License Agreement states no more than if Intertech is a necessary party, it "agrees to participate in any litigation relating to or arising from one or more of the Patents[.]" (License Agreement, ¶ 3.2.)

Second, VTB unpersuasively contends that AI fails to possess exclusive control over the right to sue for infringement of the patents-in-suit because one of the Pre-Existing Licensees, Landmark Communications, Inc. ("Landmark"), has that right. While Landmark's license agreement contains language that pertains to the right to sue if the patent holder fails to do so, it is dubious whether Landmark can utilize that right. (Ex. G, ¶ 7.) The language of the license deems it "non-exclusive," id., and therefore it appears as if the licensee fails to have standing to bring suit even if it joins the patent holder. IPD, 248 F.3d at 1345. Even assuming arguendo that Landmark, or any other party, does have the right to sue, AI could "render [this] right nugatory" by granting sublicenses to any alleged infringers. Speedplay, 211 F.3d at 1251.[7] Accordingly, I find that AI "controls enforcement of the [] patent[s] for all practical purposes." Id.

1B. Right to Use the License

To determine whether a licensee possesses "all substantial rights" in a patent, the Federal Circuit has also consistently contrasted the licensee's rights to use the patent with the licensor's retained rights. See generally IPD, 248 F.3d at 1333; Speedplay, 211 F.3d at 1245. Most, if not all of the pertinent standing cases decided by the Federal Circuit involve exclusive licensees with the right to "make, use, and sell" the licensed patents. See generally IPD, 248 F.3d at 1333; Speedplay, 211 F.3d at 1245. The cases turn, in part, on the scope of the licensor's retained usage rights. See generally IPD, 248 F.3d at 1333; Speedplay, 211

---

[7] While the terms of the Agreement order AI to share any profits with Intertech, there is no obligation of payment of annual royalties on sublicenses as required in Abbott. (License Agreement, ¶ 4.1.) Therefore, granting sublicenses to any alleged infringers places no burden on AI.

7

F.3d at 1245.

For example, in Speedplay, the licensee was granted an exclusive right to "manufacture, have manufactured, distribute, market, use and sell" the patent in question. 211 F.3d at 1251. In holding that the licensee possessed "all substantial rights," and thus had standing to sue "on its own," the Federal Circuit focused on the Contribution and License Agreement which failed to reserve any usage rights for the licensor. Id. Earlier in Abbott, the licensee's grant was subject to a "limited right of the licensor to make, use, and sell products embodying the patented invention." Speedplay, 211 F.3d at 1251. Again, in IPD, the Federal Circuit's most recent pronouncement on the issue, it reaffirmed the significance it ascribes to usage rights. See IPD, 248 F.3d at 1344.

Here, the License Agreement grants AI the right to "use, practice, import, distribute, manufacture, have manufactured, offer to sell and sell" the patents. (License Agreement, ¶ 2.1.1.) Although the rights granted to AI are subject to other, pre-existing licenses, id., Intertech, just as in Speedplay, and as opposed to the licensor in Abbott, retains no rights to use the patents in any way. Speedplay, 211 F.3d at 1251.[8]

Therefore, the quality and quantity of the usage rights granted to AI, versus the notable absence of any such rights retained by Intertech, weighs in favor of concluding that AI possesses "all substantial rights" in the patents-in-suit.

1C. Right to Sublicense

A licensee's right to sub-license is also a factor to be considered in evaluating whether a license agreement transfers "all substantial rights." See Prima Tek II, 222 F.3d at 1380. For example, in Prima Tek II, the Federal Circuit was "troubled by the fact that the agreement [gave] [the plaintiff] virtually no control over the ability to sub-license the patents" and, subsequently, held that the plaintiff failed to possess "all substantial rights." Id.; see also Speedplay, 211 F.3d at 1251 (holding that, inter alia, plaintiff's unconstrained right to sublicense was salient in the determination that plaintiff possessed "all substantial rights"). The significance of the right to sublicense is derived from the considerable implication of this right on the total utility and value of the license. Prima Tek II, 222 F.3d at 1380. This significance is illustrated by the Prima Tek II court's holding that, "[b]ecause [the licensee's]

---

[8] In fact, the licensor in this case, Intertech, retains fewer rights than in Vaupel, where the licensee was held to have standing on its own despite the fact that the licensor reserved the right to "obtain patents on the invention in other countries." Vaupel, 944 F.2d at 875.

8

rights under the agreement are significantly diminished by the sub-license requirement [only to sublicense to one specific party]... we conclude that the agreement does not transfer 'all substantial rights' in the patents to [the licensee]." Id.

Here, AI possesses an absolute right to sublicense. (License Agreement, at ¶¶ 2.1.1; 2.2.) There are no restrictions on this right with the exception that the sublicenses adhere to the terms of the License Agreement, which states:

> The Parties acknowledge that Licensee intends to monitize and exploit the Patents through licensing or selling the same . . . and the Licensee shall take all steps necessary to cause any sublicense entered into by the Licensee . . . to be freely assignable by the Licensee.

Id. This unfettered freedom and implicit encouragement to sub-license is in marked contrast to cases where the licensee was not found to have standing to sue on its own. In Prima Tek II the licensee was only permitted to sublicense to one specific party, 222 F.3d at 1380, while in Abbott the licensee was liable for annual royalties on the sale of any sublicenses. Speedplay, 211 F.3d at 1251 (discussing Abbott). Here, AI can sublicense to anyone it chooses and this is in further support of the conclusion that the grant was for "all substantial rights." Prima Tek II, 222 F.3d at 1380.

Clearly, AI is an exclusive licensee with the unlimited right to make, use, sell, and sublicense the patents-in-suit, while Intertech retains no such rights. Indeed, AI controls the right to sue for infringement of the patents-in-suit, with no obligations to Intertech. As, AI possesses "all substantial rights" in the patents-in-suit, it has standing to independently sue VTB for patent infringement.

## IV. CONCLUSION

For the reasons set forth above, VTB's motion for summary judgment is DENIED. In accordance with the Pretrial Scheduling Order (Dckt. 14), no party may make a dispositive motion returnable after August 5, 2005. A joint pretrial order is due on or before November 9, 2005, and this case remains on the December 2005 trailing trial calendar. The Clerk of Court is instructed to CLOSE this motion and REMOVE the motion from my docket.

**IT IS SO ORDERED.**
New York, New York
July __, 2005

_____
U.S.D.J.